

1  JOHN A. O'MALLEY (State Bar No. 101181)
   NICOLE E. KRASNY (State Bar No. 204409)
2  **FULBRIGHT & JAWORSKI L.L.P.**
   865 South Figueroa Street
3  Twenty-Ninth Floor
   Los Angeles, California 90017-2576
4  Telephone: (213) 892-9200
   Facsimile: (213) 680-4518
5
   Attorneys for Plaintiff
6  E-STAMP CORPORATION

7

8              UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

11  E-STAMP CORPORATION, a          ) No. CV-99-9287 (GAF) (MANx)
    corporation,                    )
12                                  ) **FINDINGS OF FACT AND**
              Plaintiff,            ) **CONCLUSIONS OF LAW PRESENTED BY**
13                                  ) **PLAINTIFF E-STAMP CORPORATION**
    v.                              )
14                                  ) [PROPOSED] [REVISED PURSUANT TO
                                    ) JUNE 2, 2000 ORDER]
15  DAVE LAHOTI, an individual,     )
                                    )
16            Defendant.            ) TRIAL DATE: May 30, 2000
                                    ) COURTROOM: Hon. Gary A. Feess
17                                  )
                                    )
18                                  )
                                    )
19  _____)

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).
21

22      This matter was tried to the Court without a jury on May 30,

23  May 31 and June 1, 2000.  John A. O'Malley and Nicole E. Krasny,

24  Fulbright & Jaworski L.L.P., represented plaintiff E-Stamp

25  Corporation.  Neil A. Smith, Limbach & Limbach, and Brett P. Wakino

26  represented defendant Dave Lahoti.  Pursuant to Local Rule 13.6,

27  the Court received the parties' direct evidence by way of

28  deposition excerpts and declarations.  The parties cross-examined

DOCUMENT
PREPARED ON
RECYCLED
PAPER

-1-

1   all witnesses in open court.   Having received and considered the

2   evidence and argument of counsel, the Court hereby makes the

3   following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

### A.   Jurisdiction, Venue and Parties

6   1.   This case arises under the Lanham Act, 15 U.S.C. Section

7   1125 et seq.   The parties have stipulated, and this Court agrees,

8   that it has jurisdiction over all Lanham Act claims and

9   substantially related unfair competition claims and supplemental

10  jurisdiction over all other state claims. 28 U.S.C. §§ 1338(a),(b),

11  1367(a); (See Pre-trial Conference Order ("PTCO"), ¶2)

12  2.   The parties have stipulated, and this Court agrees, that

13  venue is proper in this Court in that the defendant resides in this

14  judicial district and a substantial part of the events or omissions

15  giving rise to the claims occurred in this judicial district.   28

16  U.S.C. § 1391(b); PTCO ¶2 .

17  3.   Plaintiff E-Stamp Corporation ("E-Stamp Corp." or

18  "Plaintiff") is a corporation organized and existing under the laws

19  of the State of Delaware, with its principal place of business in

20  Redwood City, California.

21  4.   Defendant Dave Lahoti ("Lahoti") is an individual

22  residing in Orange County, California.

### B.   Plaintiff's Trademark and Business

24  5.   E-Stamp Corp. is the owner of Federal trademark number

25  2,152,671 for the mark E-STAMP (the "E-Stamp Federal Trademark").

26  (Tr. Ex.[1]/27; (PTCO ¶5(a).) E-Stamp Corp. applied for the E-Stamp Federal

---

[1]/   Tr. Ex. references are to Trial Exhibits.   Dec. references
are to Declarations.   Depo. references are to Depositions.
09902524/588961.1

DOCUMENT PREPARED ON RECYCLED PAPER

1  Trademark on January 3, 1994. The United States Patent & Trademark

2  Office ("USPTO") issued the E-Stamp Federal Trademark on April 21,

3  1998. *Id.*

4      6.   E-Stamp Corp. is in the business of designing, testing

5  and selling software enabling the user to purchase U.S. postage

6  directly on the Internet and print postage onto envelopes through

7  the user's own computer printer, thus saving trips to the Post

8  Office and acquisition and maintenance of postage meter equipment.

9  Through years of design efforts and with the approval of the United

10 States Postal Service ("USPS"), E-Stamp Corp. is now one of the

11 several companies permitted to offer sales of postage over the

12 Internet. *See Egan Decl. ¶ 2; Egan Trial Testimony; Egan Deposition, at 23, 26;*

13     7.   E-Stamp Corp. participates in USPS' Internet Based

14 Indicia Program ("IBIP") which entails a multi-stage approval

15 process leading to authorization to provide enabling software and

16 to sell Internet postage throughout the United States. Companies

17 participating in IBIP, such as E-Stamp Corp., go through "alpha"

18 and "beta" testing before approval. E-Stamp Corp. was permitted to

19 conduct "beta" testing initially in two markets, metropolitan

20 Washington D.C. and the San Francisco Bay Area. The "beta" testing

21 area was later expanded to include all of California. E-Stamp

22 Corp. was approved to provide its software and services nationally

23 in August 1999. *Egan Decl. ¶¶ 2,3; Egan Suppl. Decl. ¶¶ 2-6; Egan Trial Testimony;*

24     8.   During "beta" testing, E-Stamp Corp. was limited to media

25 advertising in the markets in which "beta" testing was being

26 conducted. *Egan Trial Testimony*

27     9.   Access to and availability of the Internet is critical to

28 E-Stamp Corp.'s success as an Internet postage company. On March

DOCUMENT PREPARED ON RECYCLED PAPER

1 || 9, 1996, E-Stamp Corp. acquired the domain name "e-stamp.com" and

2 || later "estamp.com." E-Stamp Corp. uses its web site on its domains

3 || to advertise its business to the public. E-Stamp Corp.'s web pages

4 || show the extensive reliance it places on the Internet web site.

5 || (Tr. Exs. 29, 84.) E-Stamp Corp. identifies its products, the

6 || method by which customers obtain and use Internet postage and many

7 || other facts about E-Stamp Corp. and its products. Through its

8 || advertising and marketing efforts and as a consequence of receiving

9 || USPS approval, E-Stamp Corp. has received substantial notice in the

10 || press regarding its goods and services marketed under its E-STAMP

11 || mark.  (Trial Exs. 30-34.)

12 ||      **C.    Lahoti's Use of Plaintiff's Trademark**

13 ||      10.  Lahoti is a 32-year old ~~itinerant~~ computer systems

14 || administrator who owns or has owned at least 110 Internet domains.

15 || (Lahoti Depo. 61:11-18.)

16 ||      11.  In late 1997 or early 1998, Lahoti began following the

17 || Internet postage industry through magazine articles and learned of

18 || the existence of E-Stamp Corp. ~~In the first week of November 1998,~~

19 || ~~Lahoti~~ found himself between jobs. At that time he registered over

20 || thirty domains, including "estamps.com" on November 8, 1998, with

21 || Network Solutions, Inc. ("NSI"), the company that regulates domain

22 || assignment.    (Lahoti  Dec.  ¶16;  Lahoti  Depo.  58:3-59:1.)

23 || ~~Importantly,~~ At the time he registered the "estamps.com" domain, he

24 || "assumed" E-Stamp Corp. owned a trademark in E-STAMP.  (Lahoti

25 || Depo. 55:19-57:11; Lahoti Dec., ¶17.)  Lahoti registered these

26 || domains in the names of admittedly non-existent business entities,

27 || "estamps.com" and simply "estamps," a domain name one letter, "s",

28 ||

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  different from E-Stamp Corp.'s domain name and only slightly

2  different from the mark E-STAMP. *See Lahoti Depo., at 48-49.*

3         12.   On November 9, 1998, the day after he registered

4  "estamps.com," Lahoti offered for sale 33 domain names, including

5  "estamps.com" and many others, such as "stamp-meter.com,"

6  "onlinestamp.com" and "webstamp.com," to E-Stamp Corp. and to its

7  competitors.  (Tr. Ex. 3.)  ~~Lahoti received no response.  (Lahoti~~

8  ~~Depo. 15:5-10:11.)~~

9         13.   In February 1999, Lahoti asked his younger brother

10  Rajendra Lahoti to create a web page on the "estamps.com" domain

11  referring to "estamps" and "estamps.com" in connection with the

12  Internet postage business.  (Lahoti Depo. 92:12-93:13.)  Lahoti

13  approved of the web page at or about the time it first appeared on

14  the Internet on February 16, 1999.  Lahoti admitted that he was

15  "proud" of his brother for preparing the web page.  (Lahoti Depo.

16  97:13-18.)

17         14.   The web page that Lahoti ran on the "estamps.com" website

18  described "estamps" as:

19              stamps in electronic form....eStamps allow new
                ways for paying and affixing postage.   The
20              concept of "ePostal" (electronic postal) came
                about recently and has already been approved
21              by the USPS.   eStamps are faster and more
                convenient than regular stamps because you can
22              electronically place the special stamps by
                printing them on ordinary laser printers . . .
23              . You can buy eStamps at a very small scale
                and they are ideal to the average person on
24              the 'net.  Soon, eStamps will be the industry
                standard when buying postage, and eStamps.com
25              will be there!

26  (Trial Ex. 8.)

27         15.   Lahoti ~~begrudgingly~~ admitted that he held the

28  "estamps.com" domain for profit and that running the web page would

1  increase the value of the domain in an eventual sale. (Lahoti

2  Depo. 105:25-109:1.) *(see also 127:2-20.)*

3      16.  Lahoti received at least a dozen e-mail responses from

4  the running of the webpage "estamps.com" from February 16, 1999 to

5  February 28, 1999. (Lahoti Depo. 98:22-99:23.) Although Lahoti

6  claims to have saved none of these e-mails or responses, he admits

7  that correspondents asked both general and technical questions

8  about Internet postage. Lahoti answered these questions, but did

9  not refer correspondents to E-Stamp Corp. (Lahoti Depo. 99:24-

10  103:22.)

11      17.  ~~Lahoti made no effort whatsoever~~ *Lahoti's website failed* to distinguish his

12  purported services from those provided by E-Stamp Corp. or to

13  reduce or avoid likely confusion on the part of the consumer. (Tr.

14  Ex. 8.)

15      18.  On February 19, 1999, E-Stamp Corp. learned that Lahoti

16  had launched the web page on the "estamps.com" domain. (Eagan Dec.

17  ¶9.)

18      19.  On February 26, 1999, E-Stamp Corp., through counsel,

19  demanded that Lahoti cease and desist from any use of the E-STAMP

20  mark and domain and take curative steps and agree to no further use

21  of these or any other confusingly similar marks to E-STAMP. (Tr.

22  Ex. 5.) Lahoti received~~, but did not respond to,~~ *on* E-Stamp Corp.'s

23  demand. *Lahoti Depo., at 40:15 et sq.*

24      20.  On March 1, 1999, knowing of E-Stamp Corp.'s superior

25  rights to the E-STAMP mark, Lahoti applied for federal trademark

26  registration of ESTAMPS for use in the same business as E-Stamp

27  Corp.--Internet postage. ~~(Tr. Ex. 6.)~~ *Lahoti Depo., at 40:15 et sq.; Tr. Ex 6.* In making this application,

28  Lahoti falsely represented that he believed he was entitled to use

09902524/588961.1

-6-

DOCUMENT PREPARED ON RECYCLED PAPER

1   the mark in commerce, even though he knew (through his earlier

2   receipt of the cease and desist letter, Tr. Ex. 5) of E-Stamp

3   Corp.'s trademark. (Lahoti Depo. 43:7-44:3) Lahoti also falsely

4   represented that:

> to the best of his knowledge and belief no
> other person, firm, corporation, or
> association has the right to use the mark in
> commerce, either in the identical form thereof
> or in such near resemblance thereto as to be
> likely, when used on or in connection with the
> goods/services of such other person, to cause
> confusion, or to cause mistake, or to deceive

10  In the same application, Lahoti also represented that his intention

11  was to actually use the mark as part of an Internet postage

12  business. (Tr. Ex. 6.) Lahoti now ~~admits~~ agrees that he believed that

13  the term ESTAMPS was generic at the time he filed for trademark

14  protection showing that his trademark application was made

15  fraudulently.

16  21. ~~Lahoti's claimed participation in the regulated Internet~~
    ~~postage industry is, at best, highly misleading.~~ Regarding Lahoti's claim that he participated in the internet postage industry) Lahoti admitted

18  that he prepared no business plan, had not approached the industry

19  regulator USPS, had obtained no financing and had formed no

20  business entities. The full extent of his efforts in the Internet

21  postage business was to talk to a couple of neighbors, to run web

22  pages and to obtain and offer to sell domains. (Lahoti Depo.

23  48:19-50:19.)

24  22. In his declaration filed at trial, Lahoti admitted that

25  he offered his domain "estamps.com" for sale the day after

26  registration, but further claimed that his "real motive was to

27  establish an ongoing relationship where I would be able to

28  contribute my energy, ideas and domains as it pertains towards the

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  new found electronic stamps industry." (Lahoti Dec. ¶18.)

2  ~~Lahoti's vague and belated~~ statement of intent does nothing ~~to~~

3  ~~overcome the compelling inference arising from his undisputed~~

4  ~~conduct: Lahoti intended to sell "estamps.com" to E-Stamp Corp. or~~

5  ~~its competitors for profit the day after he registered the domain.~~

6      23. Lahoti operates with a clear and undeniable profit

7  motive. *The evidence establishes that he* ~~Trafficking in domains is the only income-producing~~

8  *traffics in domain names for profit* ~~business in which Lahoti engages in connection with the domains he~~

9  ~~registered.~~ In May 1998, Lahoti sold the domain "emailpager.com"

10 for $3,300. In March 1999, he sold "euniverse.com" to a company

11 which became EUniverse, Inc. for $7,500 cash and 15,000 restricted

12 shares in EUniverse, Inc. If marketable, these shares would be

13 worth over approximately $100,000 at current valuations. (Lahoti

14 Depo. 64:13–67:2.)

15      D.  ~~Procedural History and~~ Contempt

16      24. On May 6, 1999, E-Stamp Corp. filed this action and

17 applied for a temporary restraining order and OSC re preliminary

18 injunction. On May 10, 1999, this Court (per Judge David O.

19 Carter) granted a temporary restraining order and order to show

20 cause re preliminary injunction based on Lahoti's infringement of

21 E-Stamp Corp.'s trademark. (Tr. Ex. 63.) Specifically, this Court

22 enjoined Lahoti from, *inter alia*, using the "estamps.com" website

23 or confusingly similar marks in connection with the Internet. (Tr.

24 Ex. 63.)

25      25. ~~In opposition to the preliminary injunction, Lahoti urged~~

26 ~~that the E-STAMP mark was generic. However, on June 14, 1999,~~

27 ~~Judge Carter rejected Lahoti's genericness~~ defense to the

28 ~~preliminary injunction.~~ *On June 14, 1999,* The Court granted E-Stamp Corp.'s motion

DOCUMENT
PREPARED ON
RECYCLED
PAPER

1  for a preliminary injunction, enjoining Lahoti from using his

2  website "estamps.com" and further ordering Lahoti to include a

3  disclaimer on this website. (Tr. Exs. 65, 66.)

4    26. Beginning in September 1999 and in direct violation of

5  the preliminary injunction, Lahoti referred Internet users who

6  reached his "estamps.com" website to a new website established and

7  registered by Lahoti-- "estampsnow.com," through a description

8  appearing in the URL directory line. During this time,

9  "estampsnow.com" posted material which used the term "e-stamp" and

10 "e-stamps" generically in the context of the Internet postage

11 business. (Tr. Ex. 69.) Lahoti further disregarded the Court's

12 Order to provide the disclaimer--"This website is not in any way

13 affiliated with E-Stamp Corporation or E-Stamp™ Internet postage."

14 (Tr. Ex. 69.) Thus, instead of displaying a disclaimer and instead

15 of stopping his infringing activities, Lahoti used his enjoined

16 website as a direct reference to his new website "estampsnow.com."

17    27. In an attempt to ascertain the owner of the website

18 "estampsnow.com," E-Stamp Corp. ran a search of Network Solutions

19 records which showed the registrant as estampsnow! and which

20 provided only the post office box number of the registrant. (Tr.

21 Exs. 68, 99.) E-Stamp Corp. conducted an investigation into the

22 owner of the listed post office box. Upon investigation, E-Stamp

23 Corp. discovered that Dave Lahoti was and is the sole box holder of

24 the post office box listed as registrant for "estampsnow.com."

25 (Archibald Dec., Tr. Ex. 98.) Moreover, Lahoti misrepresented to

26 the postal service that he was not conducting business from that

27 post office box. (Tr. Ex. 98.)

28

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

28.   At trial, Lahoti admitted that in registering domains he deleted or concealed any references to himself that might appear on searches of the NSI database.   He admitted that he concealed references to himself after learning that NSI's privacy policy prevented NSI from revealing his identity if he took these steps. NSI's database printout of Lahoti's "estampsnow.com" registration shows how Lahoti was able to conceal his ownership of "estampsnow.com."   (Tr. Ex. 99.)

29.   Lahoti's domain "estampsnow.com" differs from his domain "estamps.com" by ~~a mere insertion of~~ three letters: "now." Further, Lahoti attempted to use "estampsnow.com" in conjunction with Internet postage.   The operation of "estampsnow.com" violated this Court's Order prohibiting Lahoti from using E-Stamp Corp.'s trademark or "any confusingly similar mark in conjunction with the Internet or with the sale of postage."

30.   There   is   evidence   that   Lahoti's   use   of   the "estampsnow.com" website caused consumer confusion.   Lahoti installed a software counter to register and display the number of visits or "hits" his site received between September 29, 1999 and January, 2000.   During ~~this period, Lahoti's counter~~ registered over 137,000 hits.   At trial Lahoti claimed that he had poorly installed the counter software and that the correct number of visits or "hits" was ten percent (10%) of that number or about 13,700 hits.   In either case, this number of visits or "hits" documents consumer confusion given the close proximity of domain names between "estamp.com" and "estampsnow.com."

31.   In addition to creating the new website "estampsnow.com," Lahoti referred to at least six other known websites, all, at some

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  point in time, linking directly to "estampsnow.com." These

2  websites include: (1)"postagenow.com"; (2)"telestamps.com";

3  (3)"usastamps.com"; (4)"estampservice.com";

4  (5)"estampcollector.com"; and (6)"estampsdirect.com." A consumer

5  attempting to frequent any of these websites was immediately

6  connected to Lahoti's website "estampsnow.com." Further, Lahoti's

7  website "estampsnow.com" displayed, among other things, the

8  advertisement, "If you're just warming up to the idea of electronic

9  money, hold on to your eWallet. Here comes eStamps . . . E-Stamps

10  are the first new form of postage made available to commercial

11  businesses in 80 years." (Tr. Ex. 69.)

12      32.  Indeed, Lahoti attempted to use his "estampsnow.com"

13  website relating to Internet postage in an attempt to render E-

14  Stamp Corp.'s federally registered trademark generic. In fact,

15  Lahoti included on his website "estampsnow.com" the assertion that

16  "estamps" is a generic term. (Tr. Ex. 69.)

17      33.  On January 11, 2000, E-Stamp Corp. filed an application

18  for order to show cause re contempt. On February 8, 2000, this

19  Court held Lahoti in contempt finding that he ̶b̶l̶a̶t̶a̶n̶t̶l̶y̶ ̶i̶g̶n̶o̶r̶e̶d̶ ̶t̶h̶e̶

20  ̶C̶o̶u̶r̶t̶'̶s̶ ̶o̶r̶d̶e̶r̶s̶ ̶b̶y̶ failing to place a timely disclaimer on his

21  website "estamps.com." Moreover, the Court ordered Lahoti to turn

22  over administrative control to E-Stamp Corp. all websites which

23  ̶L̶a̶h̶o̶t̶i̶ ̶o̶w̶n̶e̶d̶ ̶o̶r̶ ̶c̶o̶n̶t̶r̶o̶l̶l̶e̶d̶ ̶w̶h̶o̶s̶e̶ ̶n̶a̶m̶e̶ ̶c̶o̶n̶t̶a̶i̶n̶e̶d̶ ̶t̶h̶e̶ ̶t̶e̶r̶m̶ ̶"̶e̶s̶t̶a̶m̶p̶.̶"̶

24  ̶O̶n̶ ̶M̶a̶r̶c̶h̶ ̶9̶,̶ ̶2̶0̶0̶0̶,̶ ̶i̶n̶ ̶c̶o̶n̶n̶e̶c̶t̶i̶o̶n̶ ̶w̶i̶t̶h̶ ̶t̶h̶e̶ ̶C̶o̶u̶r̶t̶'̶s̶ ̶F̶e̶b̶r̶u̶a̶r̶y̶ ̶1̶4̶,̶ ̶2̶0̶0̶0̶

25  ̶O̶r̶d̶e̶r̶ ̶h̶o̶l̶d̶i̶n̶g̶ ̶L̶a̶h̶o̶t̶i̶ ̶i̶n̶ ̶c̶o̶n̶t̶e̶m̶p̶t̶,̶ ̶t̶h̶e̶ ̶C̶o̶u̶r̶t̶ ̶o̶r̶d̶e̶r̶e̶d̶ ̶t̶h̶a̶t̶ ̶L̶a̶h̶o̶t̶i̶ ̶p̶a̶y̶

26  ̶t̶o̶ ̶E̶-̶S̶t̶a̶m̶p̶ ̶C̶o̶r̶p̶.̶ ̶a̶t̶t̶o̶r̶n̶e̶y̶s̶'̶ ̶f̶e̶e̶s̶ ̶i̶n̶ ̶t̶h̶e̶ ̶a̶m̶o̶u̶n̶t̶ ̶o̶f̶ ̶$̶4̶9̶1̶2̶.̶2̶0̶.̶

27      34.  On August 24, 1999, Network Solutions, Inc. deposited the

28  "estamps.com" domain into the registry of the Court and agreed to

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-11-

1  be bound by further orders of the Court regarding ownership and

2  transfer of that domain.

### E.   Evidence of Non-Genericness and Secondary Meaning

4    35.   The principal defense raised by Lahoti is the claim that

5  E-Stamp Corp.'s Federal Trademark E-STAMP is generic and entitled

6  to no trademark protection.   The parties presented evidence of

7  media usage, dictionary usage, survey results and other factors,

8  which are discussed below.

### (i)   Media Usage

10   36.   E-Stamp Corp. presented analyses and compilations of over

11  1,500 Lexis-Nexis and Internet articles prepared by and at the

12  direction of trademark attorney Linda Merritt, as well as the

13  underlying articles themselves.   (Tr. Exs. 10-19, 79-82, 114-116.)

14  Ms. Merritt found that the total generic usage, including examples

15  of articles where the mark appeared in a purely generic form and

16  articles in which the mark appeared both as generic and non-

17  generic, totaled approximately ten percent of all of the articles

18  reviewed.  Ms. Merritt also found that pure generic usage occurred

19  in about four percent of the articles reviewed. (Tr. Ex. 114.)

20   37.   Lahoti's evidence of media usage was biased.   Lahoti

21  testified on the stand that he accessed the Internet every 48 hours

22  ever since the lawsuit was filed, and that he came up with a number

23  of articles showing generic usage.   He admitted, however, that he

24  found, but deliberately excluded, articles containing non-generic

25  usage,  thus  biasing  his  results.    Because  the  "primary

26  significance" of the mark is at issue, the media usage showing

27  genericness cannot be viewed in a vacuum, but rather must be

28  compared with and analyzed against non-generic media usage.   It

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-12-

1  appears that the overwhelming media usage of the mark is in a non-
2  generic manner.

3  ### (ii) Dictionary Usage

4  38.   E-Stamp Corp. presented examples of approximately eight
5  dictionaries, none of which show entries for the term "e-stamp."
6  (Tr. Ex. 105.)

7  39.   Lahoti found one dictionary in the English language that
8  shows an entry for "e-stamp."  This dictionary identifies the term
9  in both a generic and non-generic manner.   Lahoti also found
10 several dictionaries in French, German and Italian.   Only the
11 French dictionary was presented with a translation and is therefore
12 considered here.  (Tr. Ex. 246.)  The single usage of "e-stamp" in
13 a foreign language dictionary is not persuasive of generic use
14 particularly in the face of various English language dictionaries
15 that do not use the term generically.

16 40.   Lahoti also presented the testimony of Alan Freedman,
17 author of Computer Desktop Encyclopedia, a CD-Rom encyclopedia of
18 computer and Internet terms that Mr. Freedman updates on a
19 quarterly basis.   (Tr. Ex. 245.)  Mr. Freedman's dictionary has
20 never contained the term "e-stamp," despite Mr. Freedman's constant
21 reading in the computer and Internet fields, and his quarterly
22 updates.   Mr. Freedman's admission that he first considered "e-
23 stamp" to be generic at the time he was contacted by defense
24 counsel with the prospect of being hired as an expert in this
25 matter, together with the absence of any reference to "e-stamp" in
26 his frequently updated encyclopedia, cast considerable doubt on his
27 conclusion that the mark is generic.   Further, because Mr.
28 Freedman, and another defense expert, Daniel Janal, admitted that

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-13-

1   several "e" words, such as "e-bay" and "e-trade" are not generic,

2   there is no basis for the proposition that "e" plus a word found in

3   the dictionary automatically yields a generic term.  (Tr. Ex. 117.)

4   Lastly, the fact that Mr. Freedman at first stated that "e-money"

5   is generic and then changed his testimony when he was confronted

6   with his own encyclopedia definition showing that "e-money" is not

7   generic casts further doubt on his credibility and conclusions

8   regarding genericness of the E-STAMP mark.  (Tr. Ex. 118.)

9               **(iii)      Survey Evidence**

10      41.  Plaintiff E-Stamp Corp. presented the testimony and

11  report of Dr. Sandra Cogan, who holds advanced degrees in marketing

12  and business administration, has designed and implemented over 400

13  surveys   including   more   than   80   surveys   used   in   trademark

14  litigation, and has testified in various trademark matters.

15      42.  Dr. Cogan conducted a survey to determine genericness and

16  secondary meaning at the Spring Internet World 2000 Trade Show in

17  Los Angeles on April 5, 6 and 7, 2000.  (Tr. Ex. 61.)

18      43.  Dr. Cogan and her staff screened attendees to identify

19  217 respondents on whose statements the survey results were based.

20  These respondents were screened for, among other things, use of

21  postal services, availability of computer and Internet access,

22  awareness of Internet postage as a product or service and an

23  interest in purchasing Internet postage goods or services.

24      44.  Dr. Cogan found that of these 217 qualified respondents,

25  approximately 21% believed that the mark was generic.  This result

26  supports the conclusion that the primary significance of the mark

27  is not generic.  Dr. Cogan's survey also found that the public has

28  not yet seized on a generic description of the goods and services

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-14-

1  E-Stamp Corp. or its competitors provide.  Dr. Cogan's survey also
2  found that of those who had heard the term "estamp," approximately
3  70% associated the E-STAMP mark with the goods or services of one
4  company, as opposed to more than one company, thereby tending to
5  establish secondary meaning in a high number of the respondents.

6      45.   Dr. Cogan explained that because E-Stamp Corp.'s target
7  market for Internet postage --  small office/home office or SoHo
8  users -- was a difficult market to access, she selected the
9  Internet trade show.  After Lahoti pointed out in pretrial filings
10  that a number of the 217 respondents were employed in computer or
11  Internet industries, Dr. Cogan ran a comparison of responses for
12  computer/Internet employees and all other respondents.  (Tr. Ex.
13  112.)  This comparison shows that genericness and secondary meaning
14  is established in similar percentages across these groups.

15      46.   Dr. Cogan's methodology in testing genericness was to use
16  open-ended questions akin to the Thermos-type testing utilized in
17  American Thermos Prod. Co. v. Aladdin Indus., Inc., 207 F. Supp. 9,
18  134 U.S.P.Q. 98 (D. Conn. 1962), aff'd, 321 F.2d 577, 138 U.S.P.Q.
19  349 (2nd Cir. 1963), rather than closed-ended questioning known as
20  Teflon-type testing discussed below.  The open-ended methodology
21  asks respondents to provide generic or common names for identified
22  products or services.  Dr. Cogan selected this methodology to avoid
23  speculative responses concerning the relatively new industry of
24  Internet Postage.

25      47.   Lahoti relied on the survey of Robert Lavidge, conducted
26  over the Internet on April 19 and 24, 2000.  (Tr. Ex. 592.)  There
27  are several flaws with Mr. Lavidge's survey.  First, Mr.
28  Lavidge conducted surveys for two litigations at once - - this

09902524/588961.1

-15-

1  litigation and another pending in the Northern District of

2  California regarding "e-cards". Mr. Lavidge assumed that all

3  Internet users constitute the relevant market, apparently for both

4  marks. While this Court has no ability to determine whether all

5  Internet users constitute the relevant market ~~for~~ "e-cards" *the Court is convinced based on the testimony of all witnesses*

6  (whatever "e-cards" might represent), ~~it seems~~ that all Internet

7  users are not equivalent to the relevant market of the small

8  office/home office business users. In contrast to Dr. Cogan's

9  study, Mr. Lavidge admitted that he did not test the respondents to

10  determine whether they have any interest in purchasing Internet

11  postage. Indeed, he testified that he believed that only a small

12  minority of the respondents had any awareness of the  concept of

13  Internet postage.

14      48.   Further, Mr. Lavidge purported to conduct a Teflon-type

15  study. The Teflon-type study emerges from the methodology used in

16  E.I. Dupont De Nemours & Co. v. Yoshida Int'l, Inc., 393 F. Supp.

17  502 (E.D.N.Y. 1975).   In Dupont, in a test for genericness,

18  respondents were informed of the difference between a "brand" and

19  "common or generic name," such as Chevrolet and automobile, and

20  then shown a list of words, one at a time, and asked whether each

21  was a brand or a common or generic word.   Id. at 526.   Other

22  studies produced in that matter indicated that approximately ninety

23  percent of the relevant market was aware of the existence or

24  availability of kitchenware coated with non-stick surfaces, thus

25  indicating that the Teflon-type genericness study was performed in

26  the context of a very high public awareness of the product at

27  issue.   Id. at 525.   In the DuPont study, approximately thirty-one

28  percent of respondents believed Teflon was a generic word and

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-16-

1   approximately sixty percent believed that it represented a brand.

2   <u>Id.</u> at 526.

3          49.   Mr. Lavidge's survey fails because he neglected to ask

4   the key Teflon question: "Is e-stamp a brand?"  Rather, he simply

5   asked whether "e-stamp" represented "one company or organization,"

6   or "a class of products, services or companies."  It is impossible

7   to determine from Mr. Lavidge's results how many respondents

8   believed that "e-stamp" represented a brand.  Furthermore, Mr.

9   Lavidge's study shows that slightly over forty percent of the

10  respondents did not recall ever having heard of "e-stamp" on the

11  Internet and Mr. Lavidge admitted that he suspected only a small

12  minority of the respondents had ever heard of Internet postage.  In

13  contrast to the Teflon study which was performed on a public highly

14  aware of the product, in this case, the study was performed on a

15  public that Mr. Lavidge believed was only marginally aware of the

16  product.    Taking  that  testimony  as  correct  for  purposes  of

17  analyzing his own study, this Court concludes that a substantial

18  portion of the Lavidge respondents, as much as forty percent, were

19  simply guessing.

20         50.   A determination of genericness of a particular mark

21  cannot be made outside of the context in which the mark is used.

22  If Mr. Lavidge is correct and an overwhelming portion of his

23  respondents  had  no  knowledge  of  the  product  at  issue,  those

24  respondents a fortiori are simply speculating as to whether the

25  mark in question is generic.

26              **(iv) Other Factors**

27         51.   Both  parties  presented  evidence  of  E-Stamp  Corp.'s

28  competitors' use of the mark.  Although there is some evidence of

DOCUMENT
PREPARED ON
RECYCLED
PAPER

1  generic usage in metatags, the overwhelming use is non-generic.

2  Competitors have found other terms -- such as Internet postage --

3  to be the generic descriptor.  (Tr. Exs. 20, 21, 603.)

4      52.  Plaintiff E-Stamp Corp. aggressively "policed" its mark.

5  Plaintiff produced copies of letters sent by its counsel to those

6  who used the mark generically and responses thereto.  Many

7  responses recognized plaintiff's trademark rights and promised

8  compliance.  (Tr. Exs. 24, 89, 90, 91.)

9      53.  E-Stamp Corp. presented evidence that it has aggressively

10 marketed E-STAMP Internet postage.  After receiving approval to

11 sell its products nationally in August 1999 and for the balance of

12 that year, E-Stamp Corp. spent over $18 million in marketing

13 activities, over $6 million of which was spent in "brand

14 marketing," which included television and print ads.  (Tr. Ex. 83.)

15 During the first quarter 2000 -- the most recent available period

16 -- E-Stamp Corp. spent a similar amount in total marketing expenses

17 -- over $18 million -- with over $7 million in "brand marketing"

18 including television and print ads.  (Tr. Ex. 110.)

19     54.  E-Stamp Corp. provided further evidence in the form of

20 videos consisting of its television ads.  (Tr. Exs. 87, 88.)

21     55.  Since receiving USPS approval in August 1999, E-Stamp

22 Corp.'s revenues have increased.  Revenues in 1999 totaled $1.3

23 million (Tr. Ex. 101.); first quarter 2000 revenues were nearly

24 $1.5 million (Tr. Ex. 111.)

25     56.  The Court finds that the primary significance of the E-

26 STAMP mark is not generic.  Evidence of media usage, consumer

27 surveys, dictionary usage and all other factors prove that the

28 usage and meaning of the mark is non-generic.

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-18-

57.   The Court further finds that E-Stamp Corp. has proved that the mark E-STAMP has acquired secondary meaning with consumers in the relevant market through high levels of publicity, repeated television and print advertising, extensive advertising expenditures and significant revenue, as confirmed by the Butler, Shine & Stern study conducted in November 1999 and the Cogan study conducted in April 2000.

## II.   CONCLUSIONS OF LAW

### A.   Federal Trademark Infringement Claim

#### (i)   Burden of Proof

1.   A federal trademark registration is prima facie evidence of the validity of the mark and creates a presumption in favor of the registered party. <u>Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.</u>, 198 F.3d 1143, 1146 (9th Cir. 1999); <u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.</u>, 174 F.3d 1036, 1047 (9th Cir. 1999); <u>Surf Line Hawaii Ltd. v. Ahakelo</u>, 13 U.S.P.Q.2d 1975, 1977 (D. Haw. 1989).   A trademark owner is entitled to a prima facie presumption that its registered mark is non-generic.   J. Thomas McCarthy, <u>McCarthy on Trademarks</u>, §11:43, at 11-74 (4th ed. 1998); <u>Surf Line</u>, 13 U.S.P.Q.2d at 1977.

2.   A party challenging a federally registered mark bears the burden of proving invalidity by a preponderance of the evidence. <u>Walker v. Klein</u>, 47 U.S.P.Q.2d 1649, 1652 (S.D. Cal. 1998).   Lahoti claims that the term E-STAMP is the generic term "used to describe or reference the concept of using software to enable a consumer to purchase U.S. Postage directly over the Internet and print a stamp directly from the consumer's printer."   To defeat validity, Lahoti

DOCUMENT
PREPARED ON
RECYCLED
PAPER

must show that the term E-STAMP is the common, generic name for such products and services. *Lahoti has failed to meet this burden.*

3.   Lahoti urges that E-Stamp Corp.'s use of E-STAMP is outside of its class of registration such that Plaintiff should bear the burden of proving validity of the mark.  Lahoti's argument ignores the fact that the mark bears an International Class 9 registration which includes computer software, that E-Stamp Corp. registered its use as computer software regarding postage and that E-Stamp Corp. uses the mark to brand Internet postage software. Thus, the mark is presumed to be valid and Lahoti bears the burden of proving invalidity.

### (ii) Likelihood of Confusion

4.   15 U.S.C. § 1114 provides:

> Any person who shall, without the consent of the registrant –
>
> (a)  use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive . . . shall be liable in a civil action by the registrant . . . .

The Ninth Circuit has found that use on the Internet constitutes "use in commerce." Brookfield, 174 F.3d at 1044.  E-Stamp Corp.'s trademark registration creates a presumption of national use as of January 3, 1994.  As this date is long before Lahoti had any involvement with the mark, E-Stamp Corp. is the senior user.

5.   The essential element of trademark infringement is the likelihood of confusion--whether similarity of the mark is likely to confuse customers about the source of the products.  The court in Brookfield, following AMF Inc. v. Sleekcraft Boats, 599 F.2d

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1   341, 348-54 (9th Cir. 1979), noted: "We look to the following

2   factors for guidance in determining the likelihood of confusion:

3   similarity   of   the   conflicting   designations;   relatedness   or

4   proximity of the two companies' products or services; strength of

5   [the Plaintiff's] mark; marketing channels used; degree of care

6   likely to be exercised by purchasers in selecting goods; [the

7   Defendant's] intent in selecting its mark; evidence of actual

8   confusion;   and   likelihood   of   expansion   of   product   lines."

9   Brookfield, 174 F.3d at 1053-54.

10      6.   In considering the similarity of the respective marks,

11  the Internet suffix of ".com" is irrelevant and need not be

12  considered.   Id.   Thus, the proper comparison is "E-STAMP" mark

13  versus Lahoti's use of "estamps" or "estamps.com."

14      7.   Here, the goods and services of E-Stamp Corp. and Lahoti

15  directly compete.   The marketing channels are also identical for

16  both parties--the Internet.   The "estamps" and "estamps.com" marks

17  improperly used by Lahoti are not merely similar to E-Stamp Corp.'s

18  registered mark, but are virtually identical.   Lahoti's wrongful

19  intent is plain: Lahoti deceptively used the mark to lure Internet

20  users to his own website, and then ransom the mark back to its true

21  owner.   There can be no doubt that confusion is more than likely.

22      8.   Further, there is reliable evidence of actual confusion.

23  The Butler, Shine and Stern branding survey conducted in late 1999

24  showed a high degree of confusion between estamp and e-stamps.com.

25  (Tr. Ex. 85; Eagan Test; Cogan Test.)   While Lahoti urged that his

26  domain "estamps.com" contained no hyphen, the domain names are

27  sufficiently close - - only a punctuation mark away - - that actual

28  confusion can appropriately be inferred.   That the Butler, Shine

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-21-

1    and Stern study was not prepared for purposes of litigation gives

2    it added weight.   Consumer confusion is further established by the

3    thousands   of   visits   or   "hits"   over   a   several-month   period

4    registered to Lahoti's "estampsnow.com" website which utilizes a

5    name confusingly similar to "estamp.com" in the same business of

6    Internet postage.

7         9.   Even if a consumer recognized that Lahoti's site is not

8    affiliated   with   E-Stamp   Corp.,   that   misdirection   is   still   a

9    misappropriation by Lahoti of E-Stamp Corp.'s goodwill. Brookfield,

10   174 F.3d at 1057.   Of   course,   if Lahoti's website is non-

11   operational, the consumer may be confused into believing that E-

12   Stamp Corp.'s website is non-operational, particularly in light of

13   Lahoti's earlier infringing use of the mark "estamps" on that

14   website.

15        10.   As noted by the court in Dorr-Oliver, Inc. v. Fluid-Quip,

16   Inc., 94 F.3d 376, 382 (7th Cir. 1996), "the Lanham Act forbids a

17   competitor from luring potential customers away from a producer [of

18   goods]   by   initially   passing   off   its   goods   as   those   of   the

19   producer's,  even  if confusion  as  to  the source  of  the  goods  is

20   dispelled by the time any sales are consummated."   Misdirecting

21   Internet users has been held by the Ninth Circuit to result in this

22   "initial interest confusion." Brookfield, 174 F.3d at 1062; see

23   also Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 260

24   (2nd   Cir.   1987)   (stating   that   the   probability   that   potential

25   purchasers  would  be  misled  into  an  initial  interest  in  Pegasus

26   Petroleum   worked   a   sufficient   trademark   injury);   see   also

27   Grotarian, Helferich, Schulz, Th. Steinweg Nachf. v. Steinway &

28   Sons, 523 F.2d 1331, 1342 (2nd Cir. 1975) (stating that the harm to

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-22-

1  Steinway was not "that a purchaser would buy a Grotrian-Steinweg
2  [piano] thinking it was actually a Steinway", but that the
3  purchaser "would consider it on that basis").

4      11. The instant facts are indistinguishable. The
5  registration and running of Lahoti's `estamps.com" web page
6  infringed E-Stamp Corp.'s domain `estamp.com" and `e-stamp.com."
7  The term `estamps" is confusingly similar to E-STAMP, particularly
8  when used in reference to the exact same trade or business–Internet
9  postage. In any number of ways, it is quite probable that large
10  numbers of consumers looking for E-Stamp Corp.'s brand Internet
11  postage services would find themselves at Lahoti's website. Even
12  if a consumer exercises such care and possesses such sophistication
13  so as to be able to determine that they are at the wrong site, such
14  misdirection still results in "initial interest confusion"
15  providing the necessary likelihood of confusion to sustain the
16  charge of infringement under the Lanham Act.

17          (iii)  **The E-STAMP Mark is Inherently Distinctive**

18      12. On the question of distinctiveness, marks are generally
19  classified in one of five categories of increasing distinctiveness:
20  (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5)
21  fanciful. Kendall-Jackson Winery Ltd. v. E. & J. Gallo Winery, 150
22  F.3d 1042, 1047 (9th Cir. 1998). The latter three categories of
23  marks, because their intrinsic nature serves to identify a
24  particular source of a product, are deemed inherently distinctive.
25  Id. Marks that are descriptive which are coupled with secondary
26  meaning are also characterized as distinctive. Filipino Yellow
27  Pages, 198 F.3d at 1147.
28

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1    13.   Generic marks give the general name of the product and

2    embrace an entire class of products.  <u>Kendall-Jackson</u>, 150 F.3d at

3    1047 n.8.  Descriptive marks define qualities or characteristics of

4    a product in a straightforward way that requires no exercise of the

5    imagination to be understood.   <u>Id.</u>   If a consumer must use

6    imagination or any type of multistage reasoning to understand the

7    mark's significance, then the mark does not describe the product's

8    features and the mark is deemed suggestive.  <u>Id.</u>

9    14.   In assessing the proper classification of a mark, two

10   considerations are of primary importance.  First, a composite mark

11   is to be tested for its validity and distinctiveness by looking at

12   it as a whole, rather than dissecting it into its component parts.

13   <u>Filipino Yellow Pages</u>, 198 F.3d at 1149-50; <u>Committee for Idaho's</u>

14   <u>High Desert, Inc. v. Yost</u>, 92 F.3d 814, 821 (9th Cir. 1996);

15   <u>Official Airline Guides, Inc. v. Goss</u>, 6 F.3d 1385, 1392 (9th Cir.

16   1993).  The second principle is that the mark should be examined,

17   not in the abstract, but in relation to the goods or services to

18   which it is applied.  <u>McCarthy</u>, <u>supra</u>, at § 11:51.

19   15.   The E-STAMP mark as applied to postage and mailing

20   computer software and related services is inherently distinctive.

21   Specifically, E-Stamp Corp.'s computer software allows the user to

22   access the Internet and purchase postal credit.  The postal credit

23   is stored on a separate hardware device that is attached to the

24   personal computer on which the software is installed.  When the

25   user is ready to print postage on a piece of mail, the user need

26   not access the Internet again.  Rather the software will deplete

27   the postal credit stored on the hardware device and print a special

28   code on the mail item that not only shows that the proper amount of

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-24-

1   postage has been paid, but also contains special security features.
2   This special code is a two-dimensional bar code that is then
3   scanned by the USPS much the way that UPC codes are scanned in a
4   grocery supermarket checkout line.  The term E-STAMP is suggestive
5   of the purpose and function of the software; it does not directly
6   describe it.

7   16.   The mark E-STAMP is a composite mark composed of two
8   elements: (1) "e-" and (2) "stamp."  When encountering products
9   bearing the mark E-STAMP in the marketplace, the consumer is not
10  immediately informed of the nature and function of the hardware or
11  software provided by E-Stamp Corp.  When viewing the mark E-STAMP
12  in its entirety, the consumer is not immediately informed that the
13  software/hardware combination enables the user to access the
14  Internet, purchase postal credit and print postage in the form of
15  a digital bar code on mail to be sent through the USPS in the
16  traditional way.  The consumer might well think that the system is
17  a method that provides for some sort of charge for sending e-mail
18  advertising to a vast number of targeted Internet users or some
19  other use.

20  17.   Suggestiveness of the mark E-STAMP is supported by the
21  decision in Bell South Corp. v. Planum Tech. Corp., 14 U.S.P.Q.2d
22  1555 (T.T.A.B. 1988).  In that case, the Trademark Trial and Appeal
23  Board held that the mark PHONE FORWARD was suggestive for automatic
24  telephone call diverters.  Id.  The Board reasoned that multistage
25  reasoning process (i.e. substituting the word "call" for the word
26  "phone" used as a verb) was necessary in order to ascertain the
27  nature or function of the applicant's goods.  Id. at 1556.

28

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

18.  A search of the United States Patent and Trademark Office records shows that there are numerous marks similar to E-STAMP, when applied to the goods or services described in each respective application, that have been found to be inherently distinctive in that they have either been approved for publication for opposition by the Trademark Examiner or have been registered.  (Tr. Ex. 22.)

19.  For example, ETIME is registered for an electronic system for managing human resources and payroll.  E-GOLF has been published for a service that arranges golf registrations over the Internet.  EBEEPER has been published for telecommunications services, namely, sending global computer network email messages to a radio paging device.

20.  Accordingly, the mark E-STAMP is suggestive and therefore inherently distinctive and entitled to protection under trademark law.

### (iv) The E-STAMP Mark Has Acquired Secondary Meaning

21.  As the Court has found the mark E-STAMP to be suggestive, and thus inherently distinctive, the Court need not reach the issue of secondary meaning.  However, in the alternative that the mark is found to be descriptive, the Court finds that secondary meaning has been established by the evidence presented and Lahoti has failed to successfully rebut the mark's validity with respect to secondary meaning.

22.  A mark may acquire secondary meaning when, "if in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996).  Moreover, it is well-established that

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-26-

1   consumer surveys are persuasive evidence of secondary meaning.

2   Committee for Idaho's High Desert, 92 F.3d at 822.  The federal

3   courts dictate that a "50-percent [consumer identification of the

4   mark with the source] is regarded as clearly sufficient to

5   establish secondary meaning."   Thomas & Betts Corp. v. Panduit

6   Corp., 138 F.3d 277, 295 (7th Cir. 1998).  In fact, consumer

7   identification figures well below the 50% mark have been held to be

8   sufficient to establish secondary meaning.   Conopco, Inc. v.

9   Cosmair, Inc., 49 F. Supp. 2d 242, 250 (S.D.N.Y. 1999) (stating

10  that a 21% recognition rate may be sufficient to establish

11  secondary meaning);   Thomas & Betts Corp. v. Panduit Corp., 138

12  F.3d at 295 (stating that a 30% recognition rate may be probative

13  of the issue of secondary meaning).

14       23.  Because of the widespread publicity that the E-STAMP mark

15  has attained and E-Stamp Corp.'s extensive efforts to promote the

16  mark and sales, the mark has come to be recognized as designating

17  E-Stamp Corp. as the source of goods.  Moreover, the Ninth Circuit

18  notes that the fact that a third party has "knowingly,

19  intentionally and deliberately adopted and used a trademark" offers

20  strong support for a finding of secondary meaning.   Committee for

21  Idaho's High Desert, 92 F.3d at 822-23.

22       24.  The Butler, Shine and Stern survey (Tr. Ex. 85.) was

23  performed in November 1999 just after E-Stamp Corp. had run three

24  weeks of television ads.  The Butler, Shine and Stern survey was

25  not performed for purposes of this litigation, but rather to

26  determine the success of E-Stamp Corp.'s marketing efforts.  The

27  survey showed, after only three weeks of television advertising,

28  that over 38% of respondents were aware of "estamp" or "e-

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1    stamps.com" in an aided awareness test – i.e. where their memories
2    were jogged.

3       25.   Even more, the study of expert Dr. Sandra R. Cogan tested
4    respondents in April 2000, five months later and after further
5    television and other advertising.  Dr. Cogan found awareness had
6    jumped significantly to 60%.  Dr. Cogan testified that her results
7    were consistent with the Butler, Shine and Stern results given the
8    intervening advertising.  In addition, the research of Dr. Cogan
9    indicates that upwards of 70% of the relevant market identify the
10   mark E-STAMP with a single source.   While some of Dr. Cogan's
11   secondary meaning scores might be attributable to the fact that E-
12   Stamp Corp. and its competitors had booths at the trade show where
13   the survey occurred, as urged by Lahoti, this fact does not rebut
14   a showing of secondary meaning.  Trade show participation itself is
15   a method of marketing and a factor that appropriately supports a
16   showing of secondary meaning.

17      26.   Lahoti's attack on secondary meaning rests on the flawed
18   survey of Robert J. Lavidge.  Mr. Lavidge asserts that the mark
19   does not have secondary meaning "in the minds of most Internet
20   users" and claims that Internet users are the relevant market.
21   However, the relevant market is a narrower subset of Internet users
22   than Mr. Lavidge suggests and Mr. Lavidge's survey does not provide
23   any data on secondary meaning for that subset of Internet users.

24            **(v)   The E-STAMP Mark is Not Generic**

25      27.   Lahoti has failed to rebut the validity of E-Stamp
26   Corp.'s mark.  Genericness is a question of fact.  <u>Committee for</u>
27   <u>Idaho's High Desert</u>, 92 F.3d at 821.   Moreover, "Federal
28   registration of a trademark endows it with a strong presumption of

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  validity.    The  general  presumption  of  validity  resulting  from

2  federal  registration  includes  the  specific  presumption  that  the

3  trademark  is  not  generic."  <u>Coca Cola Co. v. Overland, Inc.</u>, 692

4  F.2d  1250,  1254  (9th  Cir.  1982)  (citing  <u>Miss Universe, Inc. v.</u>

5  <u>Patricelli</u>,  408  F.2d  506,  509  (2d  Cir.  1969)).    Accordingly,

6  because  the  mark  E-STAMP  is  a  federally  registered  trademark,

7  Lahoti  bears  the  burden  of  proving  that  the  mark  is  generic.    Id.

8       28.    The  Lanham  Act  sets  out  the  test  for  genericness:  "The

9  primary  significance  of  the  ...  mark  to  the  relevant  public  ...

10 shall  be  the  test  for  determining  whether  the  ...  mark  has  become

11 the  generic  name  for  goods  or  services  on  or  in  connection  with

12 which  it  has  been  used."   <u>Id.</u>  (citing  15  U.S.C.  §  1064(3)).    To

13 determine  whether  a  mark  is  generic,  courts  examine  the:  (a)

14 generic  usage  of  the  term  by  competitors  which  has  not  been

15 challenged  by  the  mark  holder;  (b)  use  by  the  mark  holder  of  the

16 term  in  a  generic  sense;  (c)  dictionary  definitions;  (d)  generic

17 usage  in  trade  journals;  (e)  testimony  of  persons  in  the  trade;  and

18 (f)  consumer  surveys.    <u>Walker v. Klein</u>,  47  U.S.P.Q.  2d  1649,  1653

19 (S.D.  Cal.  1998).

20      29.    The  evidence  shows  that  the  E-STAMP  mark  is  not  generic

21 for  Internet  postage,  that  E-Stamp  Corp.  has  regularly  policed  its

22 mark  and  that  the  relevant  consuming  public  has  not  adopted  the

23 mark  as  a  generic  term  for  Internet  postage.    Specifically,

24 genericness  research  performed  by  Dr.  Sandra  R.  Cogan  reveals  that

25 over  70%  of  consumers  in  the  relevant  market  do  not  identify  the

26 mark  E-STAMP  as  generic  for  Internet  postage.    Accordingly,  Lahoti

27 has  not  established,  as  he  is  required  to  establish  to  defeat

28 validity,  that  the  primary  significance  of  the  mark  is  generic.

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

30.   Lahoti's survey evidence does not prove genericness.  On the contrary, the report of Mr. Lavidge tends to support a finding of non-genericness.  As discussed above, the Lavidge survey is seriously flawed and consequently entitled to little if any weight. But even if the Lavidge survey were credited, it shows that 36% of respondents believe the mark represents "a class of products or companies . . ."  If that is a proxy for genericness, that result does not support the conclusion that the <u>primary significance</u> is generic.

31.   Contrary to Lahoti's assertions, the fact that the mark E-STAMP contains the prefix "e" does not render the mark generic. As previously noted, a trademark must be examined by viewing the trademark as a whole, rather than by dissecting its parts. <u>California Cooler, Inc. v. Loretto Winery, Ltd.</u>, 774 F.2d 1451, 1455 (9th Cir. 1985).   Lahoti relies upon the decisions of <u>Continental Airlines, Inc. v. United Air Lines, Inc.</u>, 53 U.S.P.Q. 2d 1385 (T.T.A.B. 1999), and <u>Tech 2000 Realty Group v. Internet Home Services, Inc.</u>, No C-99-21135 RMW (N.D. Cal. 2000).  Although those cases are not controlling, this Court nevertheless concludes that they are distinguishable and do not support Lahoti's assertion that the E-STAMP mark is generic.

32.   First, in <u>Continental Airlines</u>, the Board did not hold that the use of "e" before a noun would always constitute a generic term.   The Board undertook the traditional trademark analysis in determining whether the term in that case--"E-TICKET"-- was generic for computerized reservation and ticketing of transportation services.   The Board found evidence, and the applicant conceded, that both parties had made widespread use of the term prior to the

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1 | application, and that other had also used it extensively in

2 | advertising before the mark was registered. The evidence presented

3 | in this case, in the Court's view, proves the contrary position.

4 |     33. Second, in the <u>Tech 2000</u> case, the plaintiff who

5 | complained of defendant's registration of the "eHomes.com" website

6 | did not hold a registered trademark in "eHomes" in any form,

7 | although it had apparently been given protection under California

8 | state law. Further, the court found that no evidence had been

9 | presented on the issue of secondary meaning. Based on these facts,

10 | the court denied the motion for a preliminary injunction.

11 |     34. Accordingly, the Court concludes that neither <u>Continental</u>

12 | <u>Airlines</u> nor <u>Tech 2000</u> support the assertion that E-STAMP is

13 | generic within the meaning of trademark law.

14 |     **(vi) <u>Lahoti's Defense of Fair Use is Inapplicable</u>**

15 |     35. Fair use derives from the provision of 15 U.S.C.

16 | §1115(b)(4), which in pertinent part, permits use "of a term. . .

17 | which is descriptive of and used fairly and in good faith only to

18 | describe the goods or services of such party. . ." As the Ninth

19 | Circuit observed, "[s]uch nominative use of a mark -- where the

20 | only word reasonably available to describe a particular thing is

21 | pressed into service - - lies outside the strictures of trademark

22 | law. . . ." <u>The New Kids on the Block v. News America Publishing,</u>

23 | <u>Inc.,</u> 971 F.2d 302, 308 (9th Cir. 1992).

24 |     36. Lahoti urges that his web pages constitute fair use of

25 | Plaintiff's mark, citing, among other cases, <u>Illinois High School</u>

26 | <u>Assoc. v. GTE Vantage, Inc.,</u> 99 F.3d 244 (7th Cir. 1996), and

27 | <u>Richards v. Cable News Network, Inc.,</u> 15 F. Supp. 2d 683, 694 (E.D.

28 | Pa. 1998). The case of <u>Illinois High School</u> is the more important

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1 of the two, but presents issues that are not remotely like those

2 before this Court.  In that case, a reverse confusion case, the

3 high school association, which was the senior user of the mark

4 "March Madness," sued for infringement approximately 11 years after

5 CBS began using the term to describe and market its coverage of the

6 NCAA Division I basketball tournament.  As a result, the court

7 concluded that it was a "dual use" term having become affixed to

8 something (the NCAA tournament) other than the high school

9 tournament.  Under those circumstances, the court determined that

10 the high school association could not bar the NCAA or anyone else

11 from using it to refer to the college tournament.

12      37.  Simply put, <u>Illinois High School</u> has nothing to do with

13 this case, where the evidence establishes that Lahoti, operating

14 under the belief that Plaintiff E-Stamp Corp. held a trademark in

15 the name E-STAMP, registered a domain name and sought to obtain

16 commercial advantage from that site at the expense of E-Stamp Corp.

17 Here, E-Stamp Corp. has done what the high school association in

18 <u>Illinois High School</u> failed to do -- it sued to protect its rights

19 in the mark E-STAMP.

20      38.  Lahoti sought to create the prospect and reality of

21 consumer confusion to drive up the value of his "estamps.com"

22 domain to Plaintiff E-Stamp Corp. and its competitors.  The term E-

23 STAMP was not the only reasonably available word to describe the

24 product or services at issue; several terms including Internet

25 postage and online postage were discussed at trial.  The E-STAMP

26 mark is not descriptive and was not used in good faith as required

27 by statute to sustain a finding of fair use.  Lahoti's use of the

28 E-STAMP mark on his "estampsnow.com" web pages after the injunction

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  issued and in violation of the injunction further shows a lack of

2  good faith.   In sum, the fair use defense is inapplicable.

3       **B.    Federal Trademark Dilution Claim**

4       39.   According to § 43(c) of the Lanham Act,

5            The owner of a famous mark shall be entitled,
            subject to the principles of equity and upon
6            such terms as the court deems reasonable, to
            an    injunction    against    another    person's
7            commercial use in commerce of a mark or trade
            name, if such use begins after the mark has
8            become    famous    and    causes    dilution    of    the
            distinctive quality of the mark, and to obtain
9            such    other    relief    as    is    provided    in    this
            subjection.
10
   15 U.S.C. § 1125(c).   To prevail on trademark dilution, E-Stamp
11
   Corp. must show that (1) Lahoti commercially used E-Stamp Corp.'s
12
   mark in commerce; (2) E-Stamp Corp.'s mark was famous; (3) the use
13
   began after the mark became famous; and (4) such use caused the
14
   dilution of the distinctive quality of the mark.   Panavision Int'l
15
   L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998).
16
17       40.   An integral aspect of Lahoti's cybersquatter scheme was

18  the sale of the "estamps.com" domain name (selling the domain name

19  was the only apparent reason Lahoti acquired it).   Indeed Lahoti

20  offered the domain name to E-Stamp Corp. and its competitors.   The

21  Ninth Circuit recently held in Panavision that this very activity,

22  branded as extortion, constitutes commercial use under both the

23  Federal Trademark Dilution Act and the California Anti-dilution

24  statute.   Id. at 1321, 1325-26.

25       41.   On April 16, 1998, the Wall Street Journal published an

26  article on E-Stamp Corp., featuring the E-STAMP mark.   A second

27  article was published in the Journal on September 21, 1998.   Other

28  articles in The Washington Post on August 3, 1998, Business Week on

   April 20, 1998, Fortune on September 7, 1998 and other publications

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1   also featured the mark.   (Tr. Exs. 30-34.)   Plaintiff presented

2   over 1,000 articles referencing Plaintiff and its product.

3        42.   Such wide coverage by our most distinguished national and

4   international publications establish the fame of the mark.  E-Stamp

5   Corp. has invested substantial time and money in developing its

6   products, partners and marketing efforts.   E-Stamp Corp. has

7   diligently and effectively established the fame of its work.

8        43.   Lahoti offered "estamps.com" for sale to E-Stamp Corp. on

9   or about November 8, 1998.  Certain of the aforementioned reference

10  articles were published before that date.   Thereafter, Lahoti

11  launched his website and infringed on the E-STAMP mark.

12       44.   The use and offering for sale of a domain name identical

13  to a valid, famous trademark results in trademark dilution.

14  Panavision, 141 F.3d at 1325-27.  The Ninth Circuit noted that the

15  public will often guess that the company's name is also the domain

16  name, and directly inputting the domain name in the form of a URL

17  is often the easiest way to access a web page.  Id.  "Moreover,

18  potential customers ... will be discouraged if they cannot find the

19  web page by typing in [the company name].... [The] use of

20  <Panavision.com> also puts Panavision's name and reputation at [the

21  infringer's] mercy." Id. at p. 1327.  Lahoti's adoption and use of

22  Plaintiff's E-STAMP mark creates precisely the same dilutive effect

23  as that which occurred in Panavision.

24       C.   Anticybersquatting Consumer Protection Act

25       45.   According to the Anticybersquatting Consumer Protection

26  Act ("ACPA") § 3002(a), 15 U.S.C. §1125(d), enacted November 29,

27  1999, "[i]n any civil action involving the registration,

28  trafficking, or use of a domain name under this paragraph, a court

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-34-

1   may order the forfeiture or cancellation of the domain name or the

2   transfer of the domain name to the owner of the mark."  Pub. L. No.

3   106-113, § 3002, 113 Stat. 1501 (1999).

4       46.   Section 3002(a) applies retroactively and "shall apply to

5   all domain names registered before, on, or after the date of the

6   enactment of [the] Act." Id. § 3010.

7       47.   An owner of a registered mark is entitled to relief under

8   the ACPA where the defendant "(i) has a bad faith intent to profit

9   from that mark, and (ii) registers, traffics in, or uses a domain

10  name that – (I) in the case of a mark that is distinctive at the

11  time  of  registration  of  the  domain  name,  is  identical  or

12  confusingly similar to that mark; or (II) in the case of a famous

13  mark that is famous at the time of registration of the domain name,

14  is identical or confusingly similar to or dilutive of that mark .

15  . ."

16      48.   Moreover, a court may assess several factors to determine

17  "bad faith intent."  According to the ACPA, factors evidencing "bad

18  faith intent" include:

19          (1)   the  trademark  or  other  intellectual
20                property rights of the person, if any, in
                  the domain name;  . . .

21          (2)   the person's intent to divert consumers
22                from the mark owner's online location to
                  a site accessible under the domain name
23                that could harm the goodwill represented
                  by the mark, either for commercial gain
24                or  with  the  intent  to  tarnish  or
                  disparage  the  mark,  by  creating  a
25                likelihood of confusion as to the source,
                  sponsorship, affiliation, or endorsement
26                of the site;

27          (3)   the person's offer to transfer, sell, or
28                otherwise assign the domain name to the
                  mark  owner  or  any  third  party  for
                  financial gain without having used, or
                  having an intent to use, the domain name

DOCUMENT
PREPARED ON
RECYCLED
PAPER

in the bona fide offering of any goods or
services . . .

   (4)   the person's provision of material and
misleading false contact information when
applying for the registration of the
domain name, the person's intentional
failure to maintain accurate contact
information, or the person's prior
conduct indicating a pattern of such
conduct;

   (5)   the person's registration or acquisition
of multiple domain names which the person
knows are identical or confusingly
similar to marks of others that are
distinctive at the time of registration
of such domain names, or dilutive of
famous marks of others that are famous at
the time of registration of such domain
names, without regard to the goods or
services of the parties . . . . <u>Id.</u>

49. At the time Lahoti registered "estamps.com" on November
8, 1998, Plaintiff E-Stamp Corp.'s mark was distinctive. As
discussed above, the mark is suggestive and therefore inherently
distinctive as of November 8, 1998. Even if the mark were
descriptive, Plaintiff is entitled to the presumption of validity
supplied by 15 U.S.C. §1057(b). The mark has was also famous as of
November 8, 1998.

50. Here, there is overwhelming evidence of bad faith intent.
Lahoti tried to sell infringing domains to E-Stamp Corp. and its
competitors for profit. Lahoti repeatedly infringed and violated
orders of this Court. Lahoti deliberately concealed his connection
with infringing websites. Lahoti knowingly obtained multiple
domain names confusingly similar and dilutive of Plaintiff's mark.
As such, E-Stamp Corp. is entitled to the transfer of all domain
names owned by Lahoti using the name "estamp" or "estamps" in any
configuration or as part of longer terms.

51. These facts prove that Lahoti was and is a "cybersquatter," one who registers and traffics in domain names confusingly similar or identical to valid, legitimate marks and tries to sell them ~~back~~ to their rightful owners.

6/14/2000

D. **California Trademark Dilution Claim**

52. A claim of trademark dilution under state law is delineated by California Business & Professions Code §14330, which provides in pertinent part:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter . . . shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods and services.

Cal. Bus. & Prof. Code § 14330(a) (West 2000).

53. Section 14330 further provides that:

> [a]ny person who uses or unlawfully infringes upon a mark registered under this chapter . . . either on the person's own goods or services or to describe the person's own goods or services . . . for purposes of enhancing the commercial value of, or selling or soliciting purchases of products, merchandise, goods or services, without prior consent of the owner of the mark, shall be subject to an injunction against that use by the owner of the mark.

Cal. Bus. & Prof. Code § 14330(b) (West 2000).

54. A California state law trademark dilution claim is subject to the same analysis as a federal dilution claim. <u>Films of Distinction, Inc. v. Allegro Film Productions, Inc.</u>, 12 F. Supp. 2d 1068, 1078 (C.D. Cal. 1998).

55. Accordingly, pursuant to the Court's discussion of E-Stamp Corp.'s federal trademark dilution, E-Stamp Corp. has proved its claim under California Business & Professions Code § 14330.

DOCUMENT PREPARED ON RECYCLED PAPER

E.   **California Unfair Competition Claim**

56.   California Business and Professions Code § 17203 provides, "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."   The statutory definition of "unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."   Id., at § 17200.   This broad language gives much latitude to courts of equity.   <u>Barquis v. Merchants Collection Assn.</u>, 7 Cal. 3d 94, 112 (1972).   As noted by the California Supreme Court in an earlier case, "It would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited . . . since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." <u>People ex. rel. Mosk v. Nat'l Research Co.</u>, 201 Cal. App. 2d 765, 772 (1962).

57.   While acknowledging that the term "unfair business practice" was undefined in California, the court in <u>People v. Casa Blanca Convalescent Homes, Inc.</u>, 159 Cal. App. 3d 509, 530 (1984), concluded that "an unfair business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."   (citing <u>F.T.C. v. Sperry & Hutchinson Co.</u>, 405 U.S. 233, 244 (1972)).   According to the California Supreme Court, unfair competition is based upon both the protection of the plaintiff's property right and upon the right of the public to protection from fraud and deceit.   <u>American Philatelic Soc'y v. Claibourne</u>, 3 Cal. 2d 689, 698 (1935).

DOCUMENT PREPARED ON RECYCLED PAPER

09902524/588961.1

-38-

58.   The California Supreme Court recently provided a fuller definition of the concept of unfairness in the antitrust context but expressly left undisturbed unfair competition in other contexts. <u>Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163 (1999).  Further, the court in <u>Motors, Inc. v. Times Mirror Co</u>., 102 Cal. App. 3d 735, 740 (1980), stated that the court must "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ."

59.   Lahoti's business practices are both unfair to E-Stamp Corp. and deceptive to consumers.  Lahoti's conduct is unjustified and wholly lacks social utility.  Lahoti's motive was to divert consumer contacts from E-Stamp Corp. to himself and then force E-Stamp Corp. to pay tribute to ransom back its own mark.  By deceptively capitalizing on the good will and reputation of E-Stamp Corp.'s mark, Lahoti defrauds consumers who are led to believe that the products and services advertised in Lahoti's websites are associated in some way to the E-STAMP mark.

60.   Lahoti's webpage falsely implied that E-Stamp Corp. was not yet in business, as well as falsely implying an association between E-STAMP and Lahoti's "estamps" and "estamps.com."  By stating that "eStamps will be the industry standard when buying postage, and eStamps.com will be there," Lahoti attempted to trade on the registered mark E-STAMP as well as E-Stamp Corp.'s advertising and promotion of that mark through its website at "e-stamp.com" and "estamp.com."  For all of the reasons discussed in connection with the trademark infringement claim, E-Stamp Corp. has proved its claim under California Business and Professions Code § 17200 et seq.

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-39-

## F.   Permanent Injunction

61.   E-Stamp Corp. is entitled to a permanent injunction once it establishes (1) irreparable injury; (2) inadequate remedies at law; and (3) actual success on the merits. <u>Avery Dennison Corp. v. Sumpton</u>, 189 F.3d 868, 881 (9th Cir. 1999); <u>Walters v. Reno</u>, 145 F.3d 1032, 1048 (9th Cir. 1998).   Here, injunctive relief is warranted.

62.   Based   on   the   aforementioned,   E-Stamp   Corp. has demonstrated actual success on the merits with respect to all of its claims, including federal trademark infringement and trademark dilution,   its   claims   under   the   Anticybersquatting   Consumer Protection Act, and its claims of state law trademark dilution and unfair competition.

63.   Similarly,   E-Stamp   Corp.   has   established   irreparable injury   and   an   inadequate   remedy   at   law.      Once   trademark infringement is established, it is ordinarily presumed that the trademark owner has sustained irreparable harm.   <u>Rodeo Collection, Ltd. v. West Seventh</u>, 812 F.2d 1215, 1220 (9th Cir. 1987); <u>Vision Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 612 n.3 (9th Cir. 1989).   However, even if there were no presumption, the irreparable injury to E-Stamp Corp. is plain.

64.   It is well-established in the Ninth Circuit that, because it   is   often   difficult   to   calculate,   damage   to   reputation   or goodwill is an irreparable harm." <u>Rent-A-Center, Inc. v. Canyon Television & Appliance</u>, 944 F.2d 597, 603 (9th Cir. 1991); <u>Cassim v. Bowen</u>, 824 F.2d 791, 795 (9th Cir. 1987).   Inasmuch as damage to one's goodwill "is virtually impossible prove," a defendant must

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1 show a reasonable basis for the belief. <u>Coca-Cola Co. v. Tropicana</u>
2 <u>Products, Inc.</u>, 690 F.2d 312, 316 (2nd Cir. 1982).

3     65.  If injunctive relief is denied, E-Stamp Corp. will
4 continue to sustain the aforementioned harm.  If the requested
5 relief issues, Lahoti will simply be compelled to avoid using or
6 trading on E-Stamp Corp.'s mark.  Lahoti will sustain no hardship
7 other than the inability to capitalize further on his deceptive use
8 of E-Stamp Corp.'s trademark.

9     66.  As previously noted, E-Stamp Corp.'s Internet website is
10 a critical component of its marketing efforts because E-Stamp
11 Corp.'s business is based on the Internet.  Any diversion of actual
12 potential customers from the website causes a loss of short-term,
13 direct sales.  Even more troublesome, E-Stamp Corp. will continue
14 to sustain irreparable harm from loss of good will, reputation and
15 visibility within this fast-paced industry.  As his "estamps.com"
16 web page (Trial Ex. 8.) makes clear, Lahoti has been trading on the
17 federally protected E-STAMP mark, likely causing confusion to any
18 consumer who reached his "estamps.com" site.  When Lahoti was told
19 to cease infringing, he simply filed a federal trademark
20 application for ESTAMPS, proving his intent to continue using and
21 infringing the E-STAMP mark.   (Trial Ex. 6.)   Because of his
22 failure to advise consumers of his lack of association with E-Stamp
23 Corp. and E-STAMP, and his plain intent to continue infringing the
24 E-STAMP mark, E-Stamp Corp. suffered and continues to suffer from
25 irreparable injury.

26     **G.   <u>Exceptional Case</u>**

27     67.  Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a),
28 provides that a court "in exceptional cases may award reasonable

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1   attorney fees to the prevailing party."  <u>The Committee for Idaho's</u>

2   <u>High Desert, Inc. v. Yost</u>, 92 F.3d 814, 825 (9th Cir. 1996);

3   <u>Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.</u>, 692 F.2d

4   1272, 1276 (9th Cir. 1982).  An award of attorneys' fees is

5   appropriate in a trademark case where the infringement is

6   "malicious, fraudulent, deliberate or wilful."

7       68.  The Court finds that this is an exceptional case within

8   the meaning of 15 U.S.C. §1117(a) and that E-Stamp Corp. is

9   entitled to recover its attorneys' fees against Lahoti.

10   ~~arm Lahoti committed acts of wilful, deliberate and malicious~~

11   ~~conduct~~.  In November 1998, Lahoti acquired the domain

12   "estamps.com" knowing of E-Stamp Corp.'s existence and assuming E-

13   Stamp Corp. owned the E-STAMP trademark.  When his efforts to sell

14   the "estamps.com" domain to E-Stamp Corp. and its competitors

15   failed, Lahoti tried to drive up the value of his domain by running

16   a web page that infringed the trademark Lahoti assumed Plaintiff E-

17   Stamp Corp. owned.  ~~That conduct triggered a reaction -- but not~~

18   ~~the expression of interest Lahoti desired.~~  When Lahoti received E-

19   Stamp Corp.'s cease and desist letter, ~~Lahoti had his assumption~~

20   ~~about Plaintiff E-Stamp Corp.'s mark confirmed.~~  At this point,

21   Lahoti could have stopped his attack on E-Stamp Corp.'s mark.

22   Instead, he filed a trademark application that can only be

23   described as bogus -- he sought protection for a mark he believed

24   was generic, declaring there was no confusion with existing marks

25   while admittedly knowing of E-Stamp Corp.'s registered mark.

26       69.  When Lahoti was enjoined from further acts of

27   infringement by preliminary injunction, Lahoti could have obeyed.

28   Instead he launched "estampsnow.com" using the URL directory line

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

-42-

1   of the enjoined "estamps.com" as a referral source and ran

2   infringing web pages on "estampsnow.com", thus leading to his being

3   found in contempt.

4       70.   To conceal his relationship with his more recent site

5   "estampsnow.com", Lahoti engaged in the deception of registering

6   with NSI under the name estampsnow! and using only a post office

7   address box, requiring E-Stamp Corp. to employ an investigator to

8   unearth Lahoti's connection.   Lahoti's attack on Plaintiff's mark

9   occurred at a time when E-Stamp Corp. was particularly vulnerable.

10  During "beta" testing, E-Stamp Corp. was limited in the breadth of

11  advertising it would reasonably be expected to undertake and only

12  after final USPS approval in August 1999 could E-Stamp Corp. be

13  expected to undertake the massive advertising and promotion

14  necessary to establish its mark more securely in the minds of

15  customers.   Yet it was at this early stage of development that

16  Lahoti directed much of his activities with the admitted hope of

17  profit through increasing the value of his web site.   ~~Simply put,~~

18  ~~Lahoti tried to hold E-Stamp Corp.'s mark hostage, forcing E-Stamp~~

19  ~~Corp. to fight genericness at an unusually early time in a brand~~

20  ~~and product's life cycle -- all for the purpose of extracting~~ *On the basis of these facts, the Court concludes*

21  ~~ransom.   There is no question~~ that Lahoti's conduct was wilful,

22  deliberate and malicious.   To the extent Lahoti used his bogus

23  trademark application as a defensive maneuver, his conduct was

24  fraudulent.   Under these facts, this case is exceptional and E-

25  Stamp Corp. should recover its attorneys' fees.

26

27

28

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1   Based on the foregoing findings of fact and conclusions of
2   law, all the evidence received at trial and the argument of
3   counsel,

4   **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

5   1.   Defendant Dave Lahoti, and all those in active concert
6   with him with notice of this order are permanently enjoined and
7   prohibited from any and all of the following acts:

8        (a)   Infringing the mark E-STAMP

9        (b)   Registering, trafficking in, or using an Internet
10  domain name that is identical or confusingly similar to E-STAMP,
11  including without limitation, any domain name having as a second
12  level the term "estamp," "estamps," with or without hyphenation or
13  other punctuation or separation, or as part of any longer word or
14  term including without limitation "estampsnow," or such second
15  level domain name having any first level domain such as ".com,"
16  ".net" or ".org";

17  2.   That defendant Dave Lahoti shall transfer forthwith to
18  plaintiff E-Stamp Corp. all rights, title, interest in, or control
19  over, any Internet domains in which he has an interest which are
20  identical to or confusingly similar to the mark E-STAMP including
21  without limitation, "estamps.com," "e-stamps.com," "estamps.net,"
22  "e-stamps.net," "estampsnow.com," "estampsnow.net" or any other
23  domain in which defendant Lahoti has an interest which uses the
24  mark E-STAMP in any form of pluralization, with or without
25  hyphenation or punctuation or as part of a longer word or term.

26  3.   That defendant Dave Lahoti shall pay to E-Stamp Corp. all
27  of E-Stamp Corp.'s attorneys' fees incurred in this matter.   E-
28  Stamp Corp. shall file with the Court on or before _June 26, 2000_

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

1  declarations establishing the amount of its attorneys' fees.

2  Lahoti shall file opposing declarations by *July 7, 2000.* The Court

3  will rule on the declarations unless the Court requests a hearing

4  by notice to all parties.

5      4.   That defendant Dave Lahoti shall pay costs to E-Stamp

6  Corp. pursuant to 28 U.S.C. § 1914 et seq. as ascertained in

7  conformance with the Local Rules of this Court.

8      IT IS SO ORDERED.

9

10  DATE: _June 14, 2000_ _____

11                     United States District Judge

12

13

14

15  PRESENTED BY:

16  JOHN A. O'MALLEY
      NICOLE E. KRASNY

17  **FULBRIGHT & JAWORSKI L.L.P.**

18

19  By _Nicole E. Krasny_ _____
        Nicole E. Krasny

20        Attorneys for Plaintiff
        E-STAMP CORPORATION

21

22

23

24

25

26

27

28

DOCUMENT
PREPARED ON
RECYCLED
PAPER

09902524/588961.1

<center>PROOF OF SERVICE
1013A (3) C.C.P. Revised 5/1/88</center>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is Fulbright & Jaworski L.L.P., 865 South Figueroa Street, 29th Floor, Los Angeles, California 90017.

    On June 12, 2000, I served the foregoing document(s) described as: **FINDINGS OF FACT AND CONCLUSIONS OF LAW PRESENTED BY PLAINTIFF E-STAMP CORPORATION - [PROPOSED] [REVISED PURSUANT TO JUNE 2, 2000 ORDER]** on interested parties in this action as follows:

Neil A. Smith, Esq., Limbach & Limbach, L.L.P., 2001 Ferry Building, San Francisco, CA 94111

Brett P. Wakino, Esq., 4266 Atlantic Boulevard, Long Beach, CA 90807

    X  **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

    **(BY PERSONAL SERVICE)** I caused the aforementioned document to be personally served at the office of the addressee.

    X  **(BY FACSIMILE)** I caused said document to be transmitted electronically to the interested parties at the facsimile numbers as stated below:

Neil A. Smith, Esq.: (415) 433 8716

Brett P. Wakino, Esq.: (562) 426-0962

    Executed on June 12, 2000 at Los Angeles, California.

    ☐  (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

    ☒  (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Amy Spada

DOCUMENT PREPARED ON RECYCLED PAPER

09902524/588961.1